UNITED STATES v. SCHERING & GLATZ (two cases).

(Circuit Court of Appeals, Second Circuit. June 8, 1908.)

Nos. 4,182, 4,186.

CUSTOMS DUTIES—CLASSIFICATION—SYNTHETIC CAMPHOR—"CAMPHOR, CRUDE."

The classification of synthetic camphor should be determined by the same considerations as of natural camphor, and where, measured by the principal tests, it still retains impurities that bring it far below the standard of refined camphor, and closely resembles the crude natural product, it is subject to classification as "camphor, crude," under Tariff Act July 24, 1897, c. 11, § 2, Free List, par. 515, 30 Stat. 197 (U. S. Comp. St. 1901, p. 1682), rather than as "camphor, refined," under section 1, Schedule A, par. 12, 30 Stat. 152 (U. S. Comp. St. 1901, p. 1627).

Appeal from the Circuit Court of the United States for the Southern District of New York.

On appeal from a decision of the Circuit Court for the Southern District of New York, affirming a decision of the Board of General Appraisers, G. A. 6,263 (T. D. 26,995), reversing a decision of the collector assessing the merchandise in question as refined camphor, under Tariff Act July 24, 1897, c. 11, § 1, Schedule A, par. 12, 30 Stat. 152 (U. S. Comp. St. 1901, p. 1627), which is as follows: "Camphor, refined, six cents per pound." The importers insist that the merchandise is entitled to free entry under section 2, Free List, par. 515, 30 Stat. 197 (U. S. Comp. St. 1901, p. 1682), which is as follows: "Camphor, crude."

J. Osgood Nichols, Asst. U. S. Atty.

Comstock & Washburn (Albert H. Washburn, of counsel), for importers.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The Board of General Appraisers found the merchandise to be crude camphor.

Additional testimony was taken in the Circuit Court and, after argument, the same conclusion was reached there. A careful consideration of the record convinces us that the contention of the importers, that the merchandise in question is crude camphor, is established by a preponderance of testimony.

We are convinced that the merchandise is not refined camphor, its melting point, concededly, is lower than that of refined natural camphor, not only, but is also lower than that of various samples of crude natural camphor. Being camphor for tariff purposes—of this, under the authorities, there can be little doubt—it closely resembles crude natural camphor and, after the impurities have been removed, it resembles refined natural camphor. "The natural camphor pure and the synthetic camphor pure will have the same melting point."

We are not impressed with the belated contention that the merchandise is a chemical compound. That it is such a compound is, in a sense, true, but it is also true of the natural product for, chemically, they have the identical formula and there seems to be hardly a disagreement upon the proposition that the synthetic article is camphor. Several of the expert witnesses were unable to tell the two apart. That synthetic camphor may be refined is not disputed; indeed an exhibit of such camphor was introduced in evidence and it approximates closely to the refined natural camphor just as the crude article corresponds to the crude natural camphor. The importers concede that their refined synthetic camphor should pay duty but they ask for the crude article the same consideration which is shown to the crude natural product.

Natural camphor of a distinctly higher grade than the merchandise in suit has, for years, been given free entry as crude camphor.

If the removal of impurities be necessary to convert the one from the crude to the refined state, why should not the same test be applicable to the other?

One of the government witnesses testified as follows:

"Q. If you can, by the process of sublimation of a synthetic article such as camphor, raise the melting point from say 162 to 175 or 176 degrees, that would convey to your mind as a chemist the conviction that you were dealing with a crude synthetic product, would it not?

"A. Yes, sir.

"Q. And that the resulting article obtained after the process of refining or sublimation showed a melting point of 175 or 176 degrees was the refined synthetic product; that would be true, wouldn't it?

"A. Yes, sir."

We are impressed with the proposition that refined camphor, whether natural or synthetic, is camphor from which the impurities have been removed and that camphor not subjected to this process is crude camphor. It seems to us plain that, measured by all the principal tests, the merchandise in question still retains impurities which bring it far below the standard of refined camphor. If not crude camphor then there is no such thing as crude synthetic camphor, as we are here dealing with it in the crudest form in which it is imported.

We deem it unnecessary to add further to the discussion of the questions involved found in the opinions below.

The decision of the Circuit Court is affirmed.

NOTE.—The following is the opinion of Platt, District Judge, in the court below:

PLATT, District Judge. The merchandise in dispute is "synthetic camphor." This is produced abroad under a patented process from the oil of turpentine, and is in no wise connected with the camphor made from the leaves and

branches of the camphor tree, which has been the subject of tariff legislation ever since 1824. It has crept into our commerce long since the passage of the act of 1897, and therefore could not eo nomine have been in the mind of the Legislature. It is made by a secret process, and our knowledge of the product can only come from physical examination and chemical analysis. It has, however, now come to be known in trade as "camphor" and is used as a substitute for camphor. Under Pickhardt v. Merritt, 132 U. S. 252, 10 Sup. Ct. 80, 33 L. Ed. 353, I suppose it must be classified as "camphor," although such treatment leads us into the quagmire of this issue.

Exhibits A and 1 are from the product in suit. Exhibit 2 is presented by the importer, and shows a synthetic camphor which has only slightly affected commerce in this country. The manner of its making is shrouded in darkness. The importer concedes it to be "refined." The government concedes that Exhibits A and 1 are not refined to the extent of responding to the test of the United States Pharmacopœia, but insists that such a test must be confined to the medicinal use of camphor; that the use of camphor in the arts is greatly in excess of its use as a medicine; and that if it is so far refined that it can be used in manufactures in the condition imported, it ought to pay duty. It is conceded that crude camphor cannot be put to any use, and for that reason it was put upon the free list in the act of 1897. The celluloid industry is very large, and when its owners use crude natural camphor they refine it upon their own premises. If they can use this merchandise without refining it, the problem is solved.

The melting and boiling points of crude camphor are undoubtedly important tests in discovering the line of demarcation between crude and refined camphor. It would seem, however, that since 90 per cent. of the imported camphor is used in the manufactures and arts and only 10 per cent. in medicines, it would be unnecessary to find all the limitations of the Pharmacopœia present in a substance before it could be classified as refined camphor for tariff purposes. If the large quantities used in manufacturing celluloid in its different forms can be satisfactorily used in a less refined state than that devoted to medicinal purposes the tests which will pass the former should be enough.

If the evidence showed the merchandise in dispute to be entirely fit for use in the condition in which it is found when imported, it ought to pay duty. The government insists that the testimony establishes that fact, but, upon careful reading, I cannot so find. It seems to require further treatment before it is thought fit for use. Therefore it cannot be said to be refined.

The government acquiesced in a decision of the Board in 1902 (G. A. 5,243 [T. D. 24,151]), which classified an importation of natural camphor from Formosa as crude, and a like product has been coming in since then free. That merchandise was in a pretty fair condition of purity, with a high melting and boiling point, and quite clean looking. It would be unfair to levy tribute on such artificial camphor as that in issue, and permit such a product as the improved Formosa to come in free.

This merchandise is on the edge of being a chemical compound, but if we are to discuss it under the camphor paragraphs, it is not possible for me to find sufficient warrant for reversing the Board. Indeed, the testimony as to the use of the merchandise as imported was far stronger before the Board than it now stands before the court.

The decision of the Board is affirmed.