## HOPKINS Co. v. UNITED STATES (No. 2282).[1]

CAMPHOR, REFINED AND CRUDE.

Camphor, known as BB camphor, was shown to have too much color and too much camphor oil to be used, until further refined, in the manufacture of pyroxylin articles, which was shown to be the chief use of refined camphor in this country, although it was also shown to be sufficiently refined for medical use according to the United States Pharmacopœia. It is classifiable under paragraph 36, tariff act of 1913, as crude and not as refined camphor.

### United States Court of Customs Appeals, June 28, 1924

APPEAL from Board of United States General Appraisers, G. A. 8631 (T. D. 39580)

[Reversed.]

*Walter Evans Hampton* for appellant.
*William W. Hoppin*, Assistant Attorney General, for the United States.

[Oral argument Dec 11, 1923, by Mr. Hampton and Mr. Hoppin]

Before MARTIN, Presiding Judge, and SMITH, BARBER, and BLAND, Associate Judges, HATFIELD, Associate Judge, participating in the decision by agreement of counsel

SMITH, Judge, delivered the opinion of the court:

Camphor imported at the port of New York was classified by the collector of customs as refined camphor and was accordingly assessed for duty at 5 cents per pound under that part of paragraph 36 of the tariff act of 1913 which reads as follows:

PAR. 36. Gum  *  *  *  camphor, refined and synthetic, 5 cents per pound

The importer protested that the importation was not refined camphor, but crude camphor, and that therefore it was dutiable at 1 cent per pound under that part of said paragraph which reads as follows:

PAR. 36. Gum  *  *  *  camphor, crude, natural, 1 cent per pound.  *  *  *

The Board of General Appraisers overruled the protest, General Appraiser Brown dissenting, and from the judgment of the board the importer appealed.

It appears from the uncontradicted testimony that camphor of the grade involved in the appeal is produced from chips of the camphor tree. The chips are placed in a wooden retort and heated by steam, thereby producing from the chips a vapor which condenses in a water box into so-called B camphor and camphor oil. The condensed B camphor, carrying some camphor oil and water, is removed from the water box and placed in canvas or straw bags, which while permitting the escape of free water and free camphor oil, retain the B camphor in the form of fine bronze crystals containing a small percentage of water, impurities, and camphor oil. That product

---

[1] T. D. 40312.

produced in the camphor forest is transported to Taihoku, where to secure uniformity of grade it is blended with other bronze crystals made in a similar way. The blend is put into pot stills which are heated by steam. The heat so applied drives off a vapor which is condensed in a flowering chamber in the form of more or less white crystals, thus producing for the first time an article that conforms to the common ordinary definition of camphor, that is to say, a white volatile, tough, gumlike translucent crystalline compound. (See Camphor—Standard Dictionary). That article is bought and sold as BB camphor.

Four chemists testified for the importer that BB camphor did not meet the test for refined camphor, and that although white to the eye, it had a color value and contained a percentage of camphor oil and other impurities which rendered it unfit for the manufacture of pyroxylin articles, the purpose for which refined camphor is chiefly used in this country.

The testimony of these witnesses was positive and uncontradicted that whether the camphor is refined for the plastic industries is determined by sedimentation tests and by tests for color and for the presence of camphor oil. The tests for color and oil are known as the alcohol test, the heat test, and the nitric acid test.

The importation when submitted to the four tests showed the presence of camphor oil and other impurities and developed a color result which required further processing at a cost of from 12 to 15 cents per pound in order to fit it for its chief use in the United States.

Harry L. Follett, the Government chemist, examined a sample of the importation and by looking at it saw that it was dry, white and crystalline, and determined its melting point at 179½ degrees centigrade. He also made an optical rotation test and found that the circular rotation of the BB camphor was 41.1 degrees. He reported that as the result of his analysis BB camphor contained approximately ninety-nine and eight one-hundredths per cent of camphor and met the requirements of the United States Pharmacopœia. Follett admitted subsequently that he found .019 per cent of nonvolatile matter principally dust and a little less than 1 per cent of oil and that the presence of oil was not the thing he went for in the analysis. He was of the opinion that 2 per cent of oil would put camphor in the category of crude, but that opinion was of little value inasmuch as his knowledge of refined camphors seems to have been limited to those used for medicinal purposes. He did not claim to have any knowledge whatever as to the degree of refinement required for camphor used in the pyroxylin industries. The conclusion of the witness that the camphor was refined was based on the requirements of the United States Pharmacopœia which prescribes no chemical tests to determine the presence of camphor oil

or the presence of any color other than that disclosed to the naked eye.

Louis Pio, a witness for the United States and a manufacturing chemist of pharmaceutical preparations, testified for the Government that he would accept as refined a camphor which met the requirements of the Pharmacopœia. He was of the opinion that the importation was refined camphor and based that opinion on the odor and physical appearance of the merchandise.

J. Russell White, a manufacturing chemist and a manufacturer of refined gum camphor, chloroform liniment, soap liniment, camphorated oil and naphthalene balls and flakes, testified that he purchased crude camphor and that he refined it in accordance *with the requirements of the United States Pharmacopœia* and that he determined the color by the physical appearance of the camphor. He said that in his opinion camphor which had a white appearance to the eye responded to the requirements of the Pharmacopœia and was refined for his business.

Arthur E. Neumer, an importer of refined camphor, testified for the Government that he bought refined camphor *on a guarantee* that it conformed *to the United States Pharmacopœia* He did not believe that BB camphor was "trade in this cou..."

In rebuttal Coblentz, a chemist, testified for the importer that a rotation test as a test for camphor is inaccurate and could not be depended upon if oil of camphor was present. He said that the test for volatile matter could not be relied upon as a test for color inasmuch as the volatile matter might contain coloring matter, which would pass through a filter. He further testified that whether camphor which contained one per cent of impurities could be considered as refined depended altogether on the use to which the camphor was put. In other words, camphor might be considered as refined for some uses, but not refined for others.

Nathan M. Clark, vice president of the celluloid company, testified that BB camphor was purchased by the plastic industry and no one else, and that it was refined by such industries before it was used. He testified positively that the color of camphor absolutely determines its availability for use in the plastic industry. He testified that he began to purchase BB camphor on April 28, 1920, and that he also purhased refined camphor which was refined in Japan and that such refined camphor was not subjected to any refining process.

In so far as the record discloses none of the witnesses on the part of the Government had any knowledge whatever as to the manufacture of pyroxylin products or of the degree of refinement required for the camphor used therein and not one of them made the tests required to determine the availability of the importation for that class of manufacture.

The tests of the Pharmacopœia are standard tests for the determination of the strength, color, and purity of drugs used as medicines or for the making of medicinal preparations. The Pharmacopœia does not furnish and does not purport to furnish the tests which will determine the fitness of articles for purely industrial use.

The evidence on the part of the Government proved nothing more than that BB camphor was of suitable strength, quality, and purity to be used as a drug or in the manufacture of medicines; but it did not meet or impeach the testimony submitted by the importers that the importation had a color and a camphor oil content which made it necessary to further process and refine it at considerable cost before it became a refined camphor available for use in the plastic industries, the purpose for which refined camphor is chiefly used in this country, as established by the uncontradicted evidence. Indeed, that BB camphor is not refined for its chief use seems to be proven to a demonstration by the fact that it is processed at considerable cost after importation in order to reduce its color value and its camphor oil component and by the fact that a refined camphor is imported from Japan which is not so processed.

The judgment of the Board of General Appraisers is against the evidence and must therefore be *reversed*.