BEFORE THE FIRST DIVISION, SEPTEMBER 18, 1957

**No. 61198.**—Nixon Nitration Works *v.* United States, protest 271103-K (A) (New York).

WILSON, Judge: The merchandise before the court was invoiced as "Five Hundred (500) Cases of 'BB' Camphor Powder." The parties have agreed that the importation consists of natural camphor, which was classified by the collector as refined natural camphor under paragraph 51 of the Tariff Act of 1930, dutiable at 5 cents per pound. The importer claims the merchandise consists of unrefined natural camphor and is properly classifiable as such under paragraph 51 of the said act, bearing duty at the rate of 1 cent per pound only. The only issue for determination, therefore, is whether the product under consideration, consisting of natural camphor, was crude or refined when imported into the United States.

Four witnesses were called by the plaintiff, all of whom had had extensive experience in dealing with camphor. George Kentos, supervisor of production for the plaintiff, has been handling a product known to him as crude camphor for over 20 years and has been familiar with refined camphor for at least 30 years. He has had long, practical training in the selection of camphors for the manufacture of plastics. He stated that, in distinguishing between crude and refined camphors, he relied principally upon the difference in color, stating that "Crude camphor is browner, much browner than the refined camphor"; that refined camphor "looks snow white." It was this witness who took samples of the imported merchandise for laboratory tests. He stated that he saw approximately 250 of the 500 cases of camphor under consideration opened and that he "found black, dirty specks in it, yellow and brown streaking in the powder, of the camphor, through the case in certain places." Based upon his practical experience, this witness testified that the material before the court consists of crude natural camphor.

Alfred Block, one of the witnesses called by the plaintiff, received a bachelor's degree in chemical engineering from City College of New York in 1944. Since he left college, he has been engaged in industrial work and has had occasion to analyze numerous samples of camphor. He was employed by the plaintiff importer in 1951, when the natural camphor under consideration was received in the United States. He identified pages 50 and 51 from a laboratory record book of the plaintiff corporation, which were admitted in evidence as plaintiff's collective exhibit 1, over the objection of one of the two sitting judges. The writing on the two pages was identified by the witness as that of one Thomas Batt, a chemist who was in the employ of the plaintiff when the involved merchandise was received. There would be considerable question about the admissibility of these records were it not for the fact that counsel for the Government, who had previously been a chemist in the employ of the United States, stipulated that he had analyzed a sample of the merchandise, represented by plaintiff's exhibit 2, and that he had obtained the same result as that shown on page 51 of plaintiff's collective exhibit 1 covering the color and fusion tests. Government counsel, however, stated that he had not performed the turbidity test. Mr. Block testified of his own knowledge

concerning this test, so it is not necessary to rely upon plaintiff's collective exhibit 1. In view of the concessions made, we think that page 51 of plaintiff's collective exhibit 1 is admissible. Page 50, in our opinion, is immaterial. In view of the concessions made by counsel for the Government, the evidence is to the effect that the color test ran from 20 to 25 and that 10 is a maximum for refined camphor. On the fusion test, the specification calls for no discoloration, but a sample of the involved merchandise was slightly yellow. While there is no concession on the part of Government as to turbidity, yet testimony in the record shows that the specification for refined camphor on turbidity is none, while the sample tested was highly turbid.

Charles Hermann, an officer of Prentiss Drug & Chemical Co. of New York, which deals in chemicals, including camphor, has had 55 years' experience in his field. He stated that he was familiar with the terms "color value" and "turbidity," as applied to camphor, and also knew the meaning of "mottled appearance," as applied to that product. Based upon his experience and upon the testimony concerning these three items, the witness stated that, in his opinion, the importation consists definitely of crude camphor (R. 67).

Irvin O. Kenen, who had had some training at Rutgers University, but who did not hold a degree, and who had had some 26 years in the practical field of chemistry, consisting of "quality control, testing, trouble-shooting on various plastic problems, and a small amount of research," all of which had been with the plaintiff corporation, testified that he had analyzed from one to two hundred samples of refined and crude natural camphor, and that, based upon the color value, turbidity value, and the heat fusion test, the product in question failed to meet the specifications for refined camphor according to all three tests; that the color specification fixed a maximum value of 10, while the imported material ran from 20 to 25; that the specification on turbidity was none, while the involved merchandise tested high; and that while the heat fusion specification called for no discoloration, the material appears yellow and was, in his opinion, unrefined natural camphor.

There is but one paragraph of the tariff act involved in the decision of this case, i. e., paragraph 51 of the Tariff Act of 1930, which reads as follows, insofar as applicable:

* * * natural crude camphor, 1 cent per pound; natural refined camphor, 5 cents per pound; * * *.

There is but little law to be found bearing upon this specific issue before us. In an early case, decided under the Tariff Act of 1897, *H. J. Baker & Bro.* v. *United States*, 5 Treas. Dec. 856, T. D. 24101, the Board of General Appraisers had before it a sample (illustrative exhibit A), admitted to be crude camphor in powder form, imported from Formosa. A chemical analysis by the Government chemist gave the following result:

The sample Exhibit A (illustrative) contained no moisture; contained a non-volatile residue represented by the decimal .375; volatile matter, by difference 99.625 per cent.

There was also before the board, as exhibit 1, a sample of the merchandise involved. The same chemist reported his analysis of exhibit 1 as follows:

The sample Exhibit 1 (the merchandise in question) contained no moisture; nonvolatile residue, .02 per cent; volatile matter, by difference, 99.98 per cent.

The board, in the *H. J. Baker & Bro.* case, *supra*, page 859, held that—

While Exhibit 1, representing the importation in question, is of a whiter and purer quality than Exhibit A, which is shown to be a sample of the crude camphor of commerce, there is no such difference in the two classes of merchandise, as disclosed by the evidence, as would justify us in classifying one of them as a crude

article and the other as refined. A difference of a little over one-third of 1 per cent in nonvolatile residue is too trifling to justify a different classification of the goods. In our judgment, the preponderance of the evidence shows that the merchandise under consideration is crude camphor, and not refined. * * *

It is difficult, however, to see how the board could arrive at this conclusion based upon the fact that one-third of 1 per centum in the difference in the impurities contained in the product was too trifling for consideration, when it seems rather clear that camphor, to be wholly refined, must be absolutely pure and a small fraction of 1 per centum may be of considerable consequence in determining the classification under a particular set of circumstances.

In *Schering & Glatz* v. *United States*, 11 Treas. Dec. 43, T. D. 26995, decided January 15, 1906, the Board of General Appraisers held that synthetic camphor, though in a sense a chemical compound, was not dutiable as such, but subject to the same classification as natural camphor, and that a grade of synthetic which resembled crude more than refined natural camphor was subject to classification as "Camphor, crude," under paragraph 515 of the Tariff Act of 1897, rather than as "Camphor, refined," under paragraph 12 of the said act. In upholding the decision of the board, the United States Circuit Court of Appeals, Second Circuit, in *United States* v. *Schering*, 163 Fed. 246, decided June 8, 1908, at page 247, stated:

We are impressed with the proposition that refined camphor, whether natural or synthetic, is camphor from which the impurities have been removed and that camphor not subjected to this process is crude camphor. It seems to us plain that, measured by all the principal tests, the merchandise in question still retains impurities which bring it far below the standard of refined camphor. If not crude camphor then there is no such thing as crude synthetic camphor, as we are here dealing with it in the crudest form in which it is imported.

The only case which we have found in which our appellate court has written an opinion upon the question of camphor is *Hopkins Co.* v. *United States*, 12 Ct. Cust. Appls. 296, T. D. 40312, decided under the Tariff Act of 1913, paragraph 36, which provided for "Gums: * * * camphor, crude, natural, 1 cent per pound; camphor, refined and synthetic, 5 cents per pound; * * *." The involved material, as imported, was identified as BB camphor. The importation was classified as refined camphor and assessed at 5 cents per pound under the said paragraph, and, as in the case before us, the importer claimed the material dutiable under the provision of the paragraph for crude natural camphor at 1 cent per pound. The Board of General Appraisers overruled the protest and upheld the classification of the collector.

In the *Hopkins Co.* case, *supra*, our appellate court, page 297, stated:

Four chemists testified for the importer that BB camphor did not meet the test for refined camphor, and that although white to the eye, it had a color value and contained a percentage of camphor oil and other impurities which rendered it unfit for the manufacture of pyroxylin articles, the purpose for which refined camphor is chiefly used in this country.

The testimony of these witnesses was positive and uncontradicted that whether the camphor is refined for the plastic industries is determined by sedimentation tests and by tests for color and for the presence of camphor oil. The tests for color and oil are known as the alcohol test, the heat test, and the nitric acid test.

The importation when submitted to the four tests showed the presence of camphor oil and other impurities and developed a color result which required further processing at a cost of from 12 to 15 cents per pound in order to fit it for its chief use in the United States.

There was a conflict between the evidence of the Government chemists and those called by the plaintiff. The witnesses for the United States testified that the product in question was refined in accordance with the "requirements of the United States Pharmacopoeia." The court, page 299, held, however, that—

The tests of the Pharmacopoeia are standard tests for the determination of the strength, color, and purity of drugs used as medicines or for the making of medicinal preparations. The Pharmacopoeia does not furnish and does not purport to furnish the tests which will determine the fitness of articles for purely industrial use.

The evidence on the part of the Government proved nothing more than that BB camphor was of suitable strength, quality, and purity to be used as a drug or in the manufacture of medicines, but it did not meet or impeach the testimony submitted by the importers that the importation had a color and a camphor oil content which made it necessary to further process and refine it * * *.

The appellate court, therefore, held the involved merchandise to be crude camphor and reversed the decision of the Board of General Appraisers.

The *Hopkins Co.* case, *supra,* was expressly called to the attention of Congress in the Summary of Tariff Information, 1929, where, at page 253, the following was stated:

*Camphor,* known as BB, having too much color and camphor oil to be used, until further refined, in the manufacture of pyroxylin articles, which was shown to be the chief use of refined camphor in this country, although sufficiently refined for medical use according to the United States Pharmacopoeia, was held to be dutiable hereunder as crude and not as refined camphor. (12 Ct. Cust. Appls. 296; Ab. 49916, Ab. (N) 5048.)

In the same Summary of Tariff Information, page 251, the attention of Congress was also expressly called to the fact that crude or BB camphor is used extensively in plastic manufacture:

**Description and uses.**—Camphor is a crystalline organic chemical compound derived from the wood of the camphor tree. Camphor is also manufactured by a synthetic process from turpentine. Commercial grades of camphor include: (1) Crude or "BB" camphor, a semirefined natural product used extensively as a plasticizer by pyroxylin plastic manufacturers. (2) Refined camphor, a white, volatile, crystalline compound, used in medicine as a circulatory stimulant in heart depression and also in pyroxylin plastics. (3) Synthetic camphor optically inactive but otherwise chemically and physically identical with natural camphor. Synthetic camphor and the semirefined BB natural camphor are used almost entirely in the pyroxylin industry which uses over three-quarters of our total consumption.

Congress, in the Tariff Act of 1930, reenacted the provision for crude natural camphor, thus, apparently, giving legislative approval to the judicial interpretation that BB camphor is properly classifiable as crude and not refined camphor.

In the present case, the evidence indicates that the imported merchandise was used by the plaintiff in the manufacture of dark-colored plastic materials, without being further refined. The evidence shows, however, that camphor used for the best grade of plastics, those which are transparent, must be pure, as is synthetic camphor. It is interesting to note, as reported in Summaries of Tariff Information, volume 1, part 3, 1948, covering paragraphs 38–51 of the Tariff Act of 1930, that—

No natural crude camphor is produced in the United States, and since 1913 no natural refined camphor has been produced domestically because of the suspension of exports of crude natural camphor for refining purposes by the Japanese camphor monopoly. Crude natural camphor, however, has been imported into the United States with approval of the monopoly for use as such.

From the *Hopkins* case, *supra,* it appears very definitely that natural camphor, which meets the specifications of refined camphor, as given in the United States Pharmacopoeia, may not be refined camphor for industrial uses. It further appears that BB camphor is not considered refined natural camphor; that whether camphor is refined for the plastic industries is determined by sedimentation tests and by tests for color and for the presence of camphor oil.

Based upon the entire record in this case, we are of the opinion and hold that the involved merchandise, even though used for low-grade, dark plastics, without further refinement, fails to meet the specifications of color, fusion, and purity values, as fixed by the industry as the standards for determining the difference between refined and unrefined natural camphor, and that the product is, therefore, unrefined natural camphor, properly dutiable as such under paragraph 51 of the Tariff Act of 1930 at the rate of 1 cent per pound, as claimed. The protest is, therefore, sustained and judgment will be entered accordingly.