LIPPINCOTT CO. *v.* UNITED STATES (No. 2048).[1]

1. NONIMPORTATION—WANTAGE OR OUTAGE.

The right of an importer to a refund of duties collected by the Government upon a measure of goods not imported is founded upon the decent rights of man, and has ever been carefully and scrupulously upheld by the courts.

2. OLIVES IN BRINE.

Duty was assessed upon the entire contents of barrels of olives in brine. The olives only, and not the brine, should have been assessed. The record, while not establishing just how much olives there were, does establish that no barrel contained more than 48 gallons. Appellant is entitled to a refund of duties collected in excess of 48 gallons to the barrel.

[1] T. D. 38646.

United States Court of Customs Appeals, March 1, 1921.

APPEAL from Board of United States General Appraisers, Abstract 43695.

[Reversed.]

*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellant.
*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence* and *John J. Mulvancy*, special attorneys, of counsel), for the United States.

[Oral argument Oct. 28, 1920, by Mr. Tompkins and Mr. Mulvaney.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal concerns the wantage, or nonshipment, of stuffed olives imported in barrels. The importations were made at the port of Cincinnati by I. T. entries. The merchandise was assessed for duty by the collector thereat upon the quantities returned by the official gauger in each instance. That there is a wantage in all such cases entitling the importer to an appropriate reduction in duties is attested by the Treasury Regulations (T. D. 23742), reading:

TREASURY DEPARTMENT,
May 26, 1902.

*Collector of Customs, New York, N. Y.*

SIR: With a view of securing uniformity between the several ports in gauging olives contained in brine and imported in hogsheads, it is hereby directed that wantage shall be determined by taking 8 per cent of the actual capacity of hogsheads, except in cases of damaged hogsheads, when actual wantage will be ascertained. In the case of all other packages wantage will be determined by actual gauge.

Respectfully,    O. L. SPAULDING, *Acting Secretary*.

While this appellant imported olives in both casks and barrels, no contention is here made as to the former, the regulative 8 per cent wantage having been duly allowed. The evidence is undisputed that the trade custom is, as was by this importer done, to import whole olives in *casks* and pitted and stuffed olives in *barrels*. So that we are here concerned only with pitted and stuffed olives imported in barrels.

While appellant's protests pray judgment that duties be refunded upon alleged nonimportation or wantage in each barrel, it also seeks a decree of this court that the methods of the gauger at one port be declared correct and those of the gauger at another port incorrect.

The court views that in any event this record duly presents for proper consideration by this court the single question of nonimportation. That question is squarely presented by the language of the protests in each case alleging:

Notice of dissatisfaction is hereby given with, and protest is hereby made against, your ascertainment and liquidation of duties, and your decision assessing duty under the tariff act of October 3, 1913, at 15 cents per gallon on "stuffed olives in brine."

You have assessed duty on a greater quantity of "stuffed olives" than was actually imported. Duty can be legally assessed only on the quantity or value actually imported, and your action in assessing on a greater quantity is illegal. We claim that in gauging the merchandise the customs officials made no allowance, or insufficient allowance, for brine.

The question is an important one and the court can not but express regret that it is presented upon a record far from satisfactory, and one which the adduced facts indicate could have been far more complete and instructive.

It being established that in these cases, as is usual, or, at least, as sometimes occurs with such importations, a wantage or non-importation exists, the importer's right to refund is stare decisis.

The right of an importer to a refund of duties collected by the Government upon a measure of goods not imported, not only rests its foundation upon the decent rights of man, but has ever been carefully and scrupulously upheld by the courts.—Marriott *v.* Brune et al. (9 How., 50 U. S., 619); Lawder *v.* Stone (187 U. S., 281); United States *v.* Habicht (1 Ct. Cust. Appls., 53; T. D. 31013); United States *v.* Shallus (2 Ct. Cust. Appls., 332; T. D. 32074); United States *v.* Zite (3 Ct. Cust. Appls., 209; T. D. 32531); Houlder *v.* United States (4 Ct. Cust. Appls., 247; T. D. 33480); Poole Co. *v.* United States (9 Ct. Cust. Appls., 271; T. D. 38216).

Liquidation of the entries here in question was had by the collector at Cincinnati as stated upon the gauger's report. Protest was thereupon made as to 936 barrels covered by these entries, 628 of which were reported by the gauger as containing over 48 gallons per barrel. The Board of General Appraisers overruled the protests and the importer appeals.

The record establishes that these olives are bought and invoiced at 48 gallons per barrel, and, when sold by the importer *by the barrel,* are so sold. That is the only evidence in this record which goes to the maximum contents of *all* the barrels contained in these importations, or which tends to definitely establish the clear content of any single barrel of any importation or entry covered by these protests. The court feels, however, that there is sufficient evidence in this record of a pertinent general character hereinafter set out to fairly establish and afford reasonable conviction in all human probabilities, that none of those barrels, as imported, contained over 48 gallons liquid measure of olives; and, therefore, the importer is entitled to that admeasurement of relief. Let us now advert to some of the accepted or proven facts.

The United States Gaugers' Manual, which, under the Customs Regulations, is made the guide of import customs gaugers, is in evidence and before us. It sets forth in cuts three "varieties" of barrels designated as the "1st," "2d," and "3d variety," as inclusive of barrels used in trade and commerce of this country. By

these cuts the record shows all import customs gaugers are, under direction of the Customs Regulations, guided. *Whether an imported barrel most resembles one or the other of these is left to the judgment of the particular gauger.* That judgment having been exercised with reference to a particular imported barrel, the gauger proceeds under the regulations to determine its contents. The factors of calculation, however, differ, according to whether the gauger deems the imported barrel of the 1st, 2d, or 3d variety. Whatever the "variety," in ascertaining its capacity he first measures the head and bung diameter in a prescribed way with a prescribed Prime and McKean gauging rod. This gauging rod has upon it three scales A, B, and C. If the gauger *deems* the imported barrel of the "1st variety" he is required to use scale A, if of the "2d variety" scale B, and if of the "3d variety," scale C, in the admeasurement of the head and bung diameters. To ascertain the average diameter of the cask or barrel he subtracts the head from the bung diameter measurement as thus obtained. If then he judges the imported cask or barrel of the 1st variety, he multiplies the thus ascertained difference by 0.55; if he judges the cask or barrel of the 2d variety, he multiplies this difference by 0.63; if he judges the cask or barrel of the 3d variety, he multiplies this difference by 0.70, and in each case by adding this result to the head diameter he thus obtains the average diameter. Hence the employed multiplier differs according to the variety the particular barrel is judged to be. The average diameter thus obtained is then used for the determination of the liquid gallon gross content of the cask or barrel. To determine the wantage a "wantage rod" is then used. The testimony is that while in this ascertainment in cases of casks and barrels of olives at the port or New York the wantage rod "is dipped down, inserted in the bunghole until we find a firm surface." On the other hand it is here shown that at Cincinnati the gauger puts his rod down to the floating olives only, thereby measuring only the vacant space above the floating olives.

These defined methods constitute the facts, the basis of this controversy.

It is urged by counsel for appellant, the importer, first, that stuffed olives in brine float and that this wantage test does not allow for the space below the olives floating in the brine in the barrel. And, secondly, that the gauger in Cincinnati uniformly judges, and here judged these barrels in which olives are imported as of the 3d variety, whereas, in fact, they are of the 2d variety.

It is clearly established by this record and not disputed that the prescribed estimation of the liquid capacity, treating these barrels of the 3d variety, would be at least 1 gallon per barrel greater than if they were deemed of the 2d variety.

Is it, therefore, by this record fairly established that these barrels in no instance in fact contained more than 48 gallons of olives liquid measurement? We think it fairly establishes that much at least.

The gauger at Cincinnati of 30 years' experience testified that in gauging imported barrels of olives he judged the barrels, including those of this appellant, as of the 3d variety, and, that if the New York gauger treated imported olive casks and barrels as of the 2d variety he was wrong. The gauger at New York, of 14 years' experience, but who probably had gauged in that time at least as many such imported barrels as his brother gauger at Cincinnati, testified as follows:

Q. What variety of gauge rod do you use in gauging stuffed olives in barrels?
*     *     *     *     *     *     *
A. We use the second variety.
Q. Had that practice always been uniform?—A. Yes.
Q. In gauging both in barrels and casks?—A. Yes, sir.

Mr. Charles W. Stone, manager of the olive department of appellant's Cincinnati house, in testifying, stated:

A. We have been selling these olives to other packers and they have contended against our gauge and it shows that we are asking 5 gallons more in a cask than they get when they use scale C. Scale B is used at the ports of New York and Chicago. Then on top of that it causes us to pay duty on about 5 gallons more to a cask, or about 75 cents on every cask that we import.

Importer's counsel at the hearing in Cincinnati offered evidence as to the actual contents of two barrels of stuffed olives imported by this appellant. That they were imported by this appellant at that port and gauged by the gauger thereat whose returns were read into the record is uncontradicted.

That these two barrels are typical of those covered by these entries we are the more constrained to find by the following questions by counsel for appellant and importer's agent's answers at the hearing in Cincinnati:

Q. Have you had sent up here to the court a barrel which Mr. Hussey, the Government gauger, recognizes as a fair barrel of these stuffed olives?—A. It is in the basement.
Q. Bearing the original marks?—A. Yes, sir.
Q. What is the number of that?—A. That barrel that was sent up is 699.

The record shows Mr. Hussey, the gauger, present at this hearing; in fact called and testifying thereat as a witness, but at no time by him or another was it disputed that this barrel was "a fair barrel of these stuffed olives."

Thereupon Mr. George C. Wager was sworn as a witness. He testified that he was "scale inspector, sampler, weigher for the Cincinnati Chamber of Commerce;" that at the request of appellant he weighed a barrel of stuffed olives; that the gross weight was

503½ pounds, net weight of the olives 271½ pounds; and that the cask contained "a fraction less than 44 gallons; that he measured them in a container certified to contain 4 gallons by Mr. Kinney, 'city sealer,'" which "has been certified as containing 4 liquid gallons;" and that as to the scales he had "tested them with test weights;" that the number of the barrel that he had examined was 633 L. C. "on one head;" on the other head "olives, Seville, Spain." Mr. Hussey, the gauger at the port of Cincinnati, in answer to a question by counsel for the importer, had previously testified that he had on file his report "showing the gauge of this particular barrel 699."

Mr. Charles W. Stone, aforesaid, recalled, then testified, that he had a copy of the gauger's report as to barrel No. 633, and read therefrom without objection: "Capacity 51.5, outage 2½, net total gallons 49," and that it was the "cask" (barrel) wherein were found the 44 gallons of olives by test.

Thereupon the record recites, "Counsel and witnesses withdrew from room to make test" of the barrel 699 declared as aforesaid to be "a barrel which Mr. Hussey, the Government gauger, recognizes as a fair barrel of these stuffed olives."

Mr. George C. Wager, aforesaid, being recalled, after the making of said test in the presence of counsel and witnesses, testified: That they had just made a test of "barrel 699 in the basement;" gross weight or capacity 488½ pounds; net 285 pounds; olives found contained in the barrel, 44 gallons.

Mr. Charles W. Stone then being recalled testified that he had a duplicate of the gauger's report "as to this barrel 699," showing "case 699, capacity 51.5, outs 2.5, net gallons 49, which we paid duty on, 49 gallons."

What accords with common understanding, was agreed by all the witnesses, that stuffed or pitted olives, in a brine solution of the strength used in these importations (29½) will float. Two illustrative samples were introduced in demonstration of this fact, showing that in a brine of that strength where space is allowed such olives will rapidly collect in solid conformation upon the surface of the brine.

It would seem to the court that without doubt there is naturally and unavoidably a wantage or nonimportation of stuffed olives in those barrels occasioned by the floating tendency of stuffed or pitted olives which has not been taken into consideration. Moreover, we think that the evidence indicates the probability that olives imported into this country are so imported in casks or barrels of the 2d variety and not the 3d. Undoubtedly the regulations are, in so far as they go, valid and fair. Whether or not their literal compliance does exact justice in such cases as these is a matter, in the first instance, for the Treasury Department and not for this court. Our functions

are concerned solely with what the facts in the particular case fairly show and the well-settled law appertaining thereto.

While, therefore, this record presents no satisfactory evidence as to the entire or precise actual wantage or nonimportation in all the imported barrels, we can not escape the conclusion that in this case the importer fairly established and is, at least, entitled to refund to the extent that duties were collected in excess of 48 gallons upon any of such barrels. There is much evidence in the record showing the probability that a much greater wantage or outage should be allowed in such cases than here decreed, but satisfactory proof thereof is not here presented further than stated. Decree accordingly *reversed.*