**BORDER BROKERAGE CO. et al.,**

v.

**UNITED STATES.**

**C.D. 2020; Protests Nos. 301489–K, etc.**

United States Customs Court,
First Division.

Aug. 14, 1958.

Lawrence & Tuttle, San Francisco, Cal. (George R. Tuttle, San Francisco, Cal., Joseph Schwartz, New York City, and Frank L. Lawrence, San Francisco, Cal., of counsel), for plaintiffs.

George Cochran Doub, Asst. Atty. Gen. (Mollie Strum, Murray Sklaroff and William J. Vitale, New York City), for defendant.

Before OLIVER, Chief Judge, and MOLLISON and WILSON, Judges.

MOLLISON, Judge.

The 68 protests enumerated in the schedule attached to and made a part of this decision were consolidated for trial. They involve importations of sperm oil from Canada which were assessed with duty at the rate of 3½ cents per gallon under the provisions of paragraph 52

of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 52, as modified by the Presidential proclamation reported in T.D. 51802. The claim made in each of the protests is for duty at the rate of 1¼ cents per gallon under the said paragraph, as modified. The competing provisions read as follows:

"Oils, animal and fish:

  *    *    *    *    *    *

"Sperm, crude........1¼¢ per gal.
"Sperm, refined or oth-
    erwise processed.....3½¢ per gal."

There does not seem to be any question but that the sperm oil in issue was not refined, and the issue, as framed by the parties, is whether the imported oil was "crude" or "otherwise processed" within the meaning of those terms as used in the statute.

Prior to taking up that issue, however, we find that 24 of the protests, besides being directed against the action of the collector in assessing duty at the 3½ cents per gallon rate, are also directed against his action in reliquidating the entries involved therein more than 60 days after his original liquidations. The said reliquidations were made by the collector under the authority of section 521 of the Tariff Act of 1930, 19 U.S.C.A. § 1521, reading as follows:

"Sec. 521. Reliquidation on account of fraud.

"If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation."

Each of the 24 protests contains the claim that—

"There was no fraud in this case and therefore section 521 is inapplicable; your reliquidation of the entry more than 60 days after liquidation is illegal and void under the provisions of section 514, and the rate imposed on liquidation should be restored."

The rate imposed on the original liquidations was 1¼ cents per gallon.

It has been held in numerous cases that where the collector reliquidates an entry under purported authority of section 521, *supra,* and his action in so doing is challenged by protest filed in this court, the burden rests upon the Government of proving that the collector had probable cause to believe there was fraud in the case. See Carey & Skinner, Inc. v. United States, 36 Cust.Ct. 84, C.D. 1756, and Waterbury Lock & Specialty Co. v. United States, 17 Cust.Ct. 87, C.D. 1025, affirmed on other grounds in United States v. Waterbury Lock & Specialty Co., 35 C.C.P.A., Customs 131, C.A.D. 384.

While counsel for the parties in these cases have both seemingly proceeded upon the basis that the extent of the Government's burden in these cases is to establish that the collector had probable cause to believe there was fraud in the case, nevertheless, we are satisfied from research and consideration of the statute involved that, while it is a condition precedent to reliquidation of an entry under section 521 that the collector find probable cause to believe there is fraud in the case, the burden of the Government *upon the trial of a protest against the reliquidation* is to establish that there was actual fraud in the case.

Section 514 of the Tariff Act of 1930, 19 U.S.C.A. § 1514, provides that liquidations—

"* * * shall, upon the expiration of sixty days after the date [thereof] * * * be final and conclusive upon all persons *(including the United States and any officer thereof)* * * *." [Italics added.]

in the absence of protest. There were no protests filed against the original liquidations involved herein.

There are only two statutory provisions which permit reliquidation of entries after 60 days after the date thereof, notwithstanding a protest was not filed, and these are contained in section 520, 19 U.S.C.A. § 1520, relating to re-

liquidations for clerical errors and for refunds in connection with the assessment of duty on household and personal effects, and section 521, relating to reliquidation on account of fraud.

Section 520 is concerned with reliquidations in the interest of the importer only, and quite obviously is founded upon considerations of decency and fairness in matters between the taxpayer and the Government. See Lippincott Co. v. United States, 11 Ct.Cust.App. 29, T.D. 38646. Section 521 is concerned with reliquidations in the interest of the Government only, and is quite obviously based upon the consideration that, if fraud actually existed in the case, the Government was deprived of the revenues justly due it and is entitled to them. See New England Fish Co. v. United States, 4 Cust. Ct. 230, C.D. 329, and Vitelli & Son v. United States, 7 Ct.Cust.App. 243, T.D. 36544, reversed on other grounds in F. Vitelli & Son v. United States, 250 U.S. 355, 39 S.Ct. 544, 63 L.Ed. 1028.

Perhaps in no better way may an objective study of the situation be facilitated than by a consideration of the Vitelli case, supra. The importer, in that case, imported and entered at the port of New York over the period from 1905 to 1907, 19 shipments of chestnuts and garlic upon which specific duties by weight were chargeable. The entries were made and duties were assessed and paid upon the basis of weighers' returns. About 5 years later, the collector of customs, being satisfied that the weighers' returns were false and fraudulent, reliquidated the entries on the basis of corrected weights and demanded payment of increased duties.

The importer elected to pay in accordance with the demand, but filed a protest and prosecuted the same before the predecessor of this court, the Board of United States General Appraisers. On the trial before the board, the Government took the position that the act of the collector in reliquidating the entries was presumptively correct and that the burden of proof was on the importer to establish that there was no fraud in connection with the original liquidations. The Board of General Appraisers held that the burden of proof was upon the Government to establish fraud. F. Vitelli & Son v. United States, 24 Treas.Dec. 75, T.D. 33115. On appeal by the Government to the Court of Customs Appeals, the decision of the board was reversed, and the cases were remanded for trial. United States v. Vitelli & Son, 5 Ct.Cust.App. 151, T.D. 34194.

On the trial under the remand, the plaintiff refused to offer testimony to rebut the presumption of fraud, and the Government also submitted the case without proof, and, following the precept of the appellate court, the board overruled the protest. F. Vitelli & Son v. United States, 27 Treas.Dec. 162, Abstract 36340.

On appeal to the Court of Customs Appeals, the latter court affirmed the decision in an opinion in which it exhaustively considered every element of the situation. Vitelli & Son v. United States, 7 Ct.Cust.App. 243, T.D. 36544.

The court's basic conclusions were that fraud vitiates whatever it touches; that a liquidation induced by fraud is no liquidation; that the collector, or his properly empowered deputies, had unlimited power to reliquidate at any time, if there was fraud in the case; that the then-existing statute, being section 21, Act of 1874 (18 Stat.L. 186),[1] making liquidation final "in the absence of fraud" after the expiration of 1 year from the

[1] "That whenever any goods, wares, and merchandise shall have been entered and passed free of duty, and whenever duties upon any imported goods, wares, and merchandise shall have been liquidated and paid, and such goods, wares, and merchandise shall have been delivered to the owner, importer, agent, or consignee, such entry and passage free of duty and such settlement of duties shall, after the expiration of one year from the time of entry, in the absence of fraud and in the absence of protest by the owner, importer, agent, or consignee, be final and conclusive upon all parties."

date of entry, did not necessitate a finding of fraud by the collector to justify reliquidation, but merely barred reliquidation "in the absence of fraud," so that if the collector suspected fraud it could not be said that fraud was absent, and that a "well-founded suspicion" was sufficient to move him to reliquidation. It was also held that the provisions in the Tariff Acts of 1890, 1909, and 1913 (akin to sec. 514 of the present act), making liquidations "final and conclusive against all persons interested therein" upon the expiration of the time within which protest might be filed, were limitations only upon the importers, and not upon the Government or the powers of collectors, and, further, that the burden of proving the material facts under a protest against the reliquidation was upon the protestant, and there was no burden upon the Government in the first instance to establish the correctness of the liquidation or the existence of actual fraud.

The Supreme Court reversed the decision of the Court of Customs Appeals (F. Vitelli & Son v. United States, 250 U.S. 355, 39 S.Ct. 544, 63 L.Ed. 1028) and remanded the case to the Board of General Appraisers. In so doing, the Supreme Court held that, under the pertinent statute, section 21 of the Act of 1874, *supra,* the collector might reliquidate an entry after 1 year from the time of entry in case of fraud, but that upon the trial before the Board of General Appraisers of an issue raised by protest against such reliquidation, the burden was not upon the importer of establishing that there had been no fraud, but upon the Government to establish the fact of fraud.

A very excellent discussion of the situation is presented in the decision written by the late Judge Hay for board three of the Board of United States General Appraisers upon the remand of the Vitelli case to the predecessor of this court. See F. Vitelli & Son v. United States, 38 Treas.Dec. 457, T.D. 38416.

The statutory law in effect during the pendency of the Vitelli case, concerning the finality and conclusiveness of liqui-dations, made disparate provision therefor with respect to the importer and with respect to the Government or collector. The Customs Administrative Act of 1890 (sec. 14) and the Tariff Acts of 1909 (subsection 14 of sec. 28) and 1913 (sec. III, par. N) provided that the decision of the collector as to the rate and amount of duties chargeable upon imported merchandise (i. e., his liquidation) "shall be final and conclusive against all persons interested therein," unless protest was filed within specified time limits, i. e., 15 or 30 days, after such liquidation. The description "all persons interested therein" was held not to be a limitation upon the powers of collectors to reliquidate, but only a limitation upon the remedies of importers. Vitelli & Son v. United States, 7 Ct.Cust. App. 243, T.D. 36544, *supra,* reversed on other grounds in F. Vitelli & Son v. United States, 250 U.S. 355, 39 S.Ct. 544, 63 L.Ed. 1028, supra. Finality of liquidation against the Government and its officers, including collectors, was provided for in section 21 of the Act of June 22, 1874, *supra,* except in cases of fraud or in cases where protests had been filed, and was 1 year from the date of entry in the absence of fraud or of protest.

The disparity in time limitation between the remedies of the importer and the rights of the Government was continued until the enactment of the existing tariff act. Section 21 of the Act of 1874, *supra,* was specifically repealed by section 643 of the Tariff Act of 1922 (42 Stat.L. 989), but, in its place, Congress enacted section 521 of that act, reading as follows:

"Sec. 521. Reliquidation of Duties.—Whenever any merchandise has been entered and passed free of duty, and whenever duties upon any imported merchandise have been liquidated and paid, and the merchandise has been delivered to the consignee, or his agent, such entry and passage free of duty and such settlement of duties shall, after the expiration of one year from the date

of entry, or after the expiration of sixty days after the date of liquidation when liquidation is made more than ten months after the date of entry, in the absence of fraud and in the absence of protest by the consignee, or his agent, or by an American manufacturer, producer, or wholesaler, be final and conclusive upon all parties. If the collector finds probable cause to believe there is fraud in the case, he may reliquidate within two years after the date of entry, or after the date of liquidation when liquidation is made more than ten months after the date of entry."

Section 514 of the 1922 act, providing for protest against the decisions, including liquidations, of the collector, provided that the collector's liquidation—

"* * * shall be final and conclusive upon all *persons*, unless the importer, consignee, or agent * * shall, within sixty days after, but not before such liquidation * * * file a protest in writing with the collector * * *." [Italics added.]

It will be seen that the first sentence of section 521 of the Tariff Act of 1922 was virtually a reenactment of section 21 of the Act of 1874. The second sentence, with respect to reliquidations upon a finding of probable cause to believe there was fraud in the case, was new matter.

The existing Tariff Act of 1930 made very vital changes in both section 514 and section 521. In section 514 of the present act, it provided that the collector's liquidation—

"* * * shall, upon the expiration of sixty days after the date of such liquidation * * * be final and conclusive upon all persons *(including the United States and any officer thereof)*, unless the importer, consignee, or agent * * * shall, within sixty days after, but not before such liquidation * * * file a protest in writing with the collector * * *." [Italics added.]

Thus it will be seen that the 60-day limitation as to finality of liquidation held to have been theretofore only upon the importer, was now also placed upon the Government and its officers. Consequently, in the reenactment of section 521, the first sentence of section 521 of the act of 1922, which, as has been said, was substantially the same as section 21 of the Act of 1874, was eliminated. Undoubtedly, this was done to further the early repose of liquidations. In Vitelli & Son v. United States, supra, the Supreme Court had pointed out the beneficial effect of such early repose in order to remove the uncertainty as to the finality of customs entries and to safeguard the security of commercial transactions.

The second sentence of section 521 of the act of 1922 was changed so as to give the collector 2 years from the date of liquidation or last reliquidation in which to act in cases where he found probable cause to believe there was fraud in the case, and to toll the running of statute during the pendency of protests.

A recapitulation of the foregoing shows the following: At all times since the passage of the Customs Administrative Act of 1890, the liquidation of an entry has been final and conclusive *upon importers* after 15, 30, or (as at present) 60 days after liquidation, in the absence of protest.

Up to the passage of the Tariff Act of 1922, the liquidation of an entry was final and conclusive *upon collectors* after 1 year from the date of entry, in the absence of protest and in the absence of fraud. Consequently, up to 1 year after the date of entry the collector had unlimited powers of reliquidation; after 1 year, he could reliquidate only for fraud, but the Government had the burden of proving fraud if the reliquidation was for fraud and was contested by protest.

During the life of the Tariff Act of 1922, the same situation obtained, except that the period during which the collector had unlimited powers of reliquidation was lengthened so as to be not less than 1 year after entry or more than 60 days

after liquidation when liquidation was more than 10 months after entry.

There was added to the law, with respect to reliquidations, for the first time, the power to reliquidate an entry *2 years after the date of liquidation* if the collector found probable cause to believe there was fraud in the case.

In the light of the decision of the Supreme Court in the Vitelli case, supra, and considering the language of section 521 of the Tariff Act of 1922, it is apparent that under that act the collector could reliquidate an entry which, by the lapse of time, might be said to have become final and conclusive as to him (1) for actual fraud, or (2) upon a finding by him of probable cause to believe there was fraud in the case. If there was actual fraud in the case, the statute of limitations upon his power to reliquidate was tolled, and there was a 2-year statute of limitations upon his power to reliquidate for probable cause to believe there was fraud in the case.

If the reliquidation on account of actual fraud took place more than 1 year after the date of entry or more than 60 days after liquidation when liquidation was more than 10 months after the date of entry, the burden was on the Government to establish actual fraud if the reliquidation was contested.

What, then, was the burden on the Government in cases where the collector had not found actual fraud to have existed, but only found that he had "probable cause to believe" that fraud existed? Quite obviously, there is less right, reason, and justice to interfere with settled liquidations where "probable cause to believe" that there is fraud is found than where actual fraud is found, and it could hardly have been the intent of Congress to have made the burden upon the Government in a contested reliquidation based upon a finding of *probable cause* to believe there was fraud *less than in a case where the collector found that actual fraud existed.*

As has been pointed out, settled liquidations may be disturbed when fraud has been shown to have actually existed on the sound reason that the Government has been deprived of revenues to which it is justly entitled. Where the collector finds "probable cause" to believe there is fraud, there is no *finding* by him that the Government has been deprived of its just revenues, so that if the reliquidation is resisted there must be a finding by a judicial tribunal of the fact of fraud which will justify setting aside what the Supreme Court has called "the finality of customs entries" and disturbing the "security of commercial transactions."

The two provisions of section 521 of the act of 1922 must be read together, and, when so read, the following appears to have been the intent of Congress: A reliquidation might be made at any time after liquidation where the collector found fraud to have existed in the case, or within 2 years after liquidation where he found probable cause to believe that fraud existed in the case. In either situation, however, if the reliquidation was contested by protest in this court, the burden was upon the Government of establishing that actual fraud existed.

As has been said, in the 1930 act, the finality and conclusiveness of liquidation against the collector was placed upon the same basis as against the importer i. e., after 60 days after liquidation in the absence of protest. No language is used in section 514 tolling the statute of limitations applicable to the collector in the case of actual fraud. The provision to that effect, formerly in the first sentence of section 521 of the act of 1922, was dropped in the enactment of section 521 of the act of 1930.

It may well be, as suggested by the Court of Customs Appeals in Vitelli & Son v. United States, 7 Ct.Cust.App. 243, 269; reversed on other grounds in F. Vitelli & Son v. United States, 250 U.S. 355, 39 S.Ct. 544, 63 L.Ed. 1028, supra, that "a liquidation induced by fraud is a nullity, absolutely void" and that the collector has power to make a new liquidation, or a reliquidation, after 60 days after liquidation and, in the absence of protest, even though the statute does not

expressly or implicitly so provide. Or it may be that the 60-day limitation, in the absence of protest, concludes the powers of the collector to reopen the same for actual fraud, leaving only the power to reliquidate within 2 years upon a finding by him of probable cause to believe there was fraud in the case.

In either case, we are of the opinion that where reliquidation is had on account of fraud, whether a finding is made of actual fraud or of probable cause to believe that fraud existed, in any suit or action concerning the dutiable status of the merchandise involved, the burden is on the Government of establishing the existence of actual fraud.

The situation as to reliquidation, upon a finding by the collector that probable cause for belief that fraud existed under section 521 of the Tariff Act of 1930, must be distinguished from the situation which obtains in the case of forfeiture proceedings under section 615 of the same act, 19 U.S.C.A. § 1615, entitled "Burden of proof in forfeiture proceedings." The latter section provides that in suits or actions brought by the United States for forfeiture of things seized by the Government officers for violations of the customs laws of the United States, the burden of proof is upon the claimant; and in suits or actions brought by the United States for the recovery of the value of any thing because of violation of any of the customs laws of the United States, the burden of proof is upon the defendant, except that, in either case, the burden of establishing probable cause for the institution of such suit or action, i. e., probable cause to support the seizure or the claim for the recovery of the value, must first be shown by the Government.

Even aside from the fact that the statute in section 615 specifically sets forth the extent of the burden of proof upon the Government, whereas in section 521 it does not, the situations are not at all analogous. The provisions of the laws of the United States for the levy-

ing of fines, penalties, or securing forfeitures for violations of the customs laws have always been considered to be entirely separate and distinct from those provisions which seek the determination of the duties properly due upon importations. The former are in the nature of summary proceedings, *in rem* or *in personam,* authorized as essential for the enforcement of the customs laws, while the latter are civil suits for the determination of the duties properly due. Zucca v. United States, 10 Ct.Cust.App. 133,. T.D. 38399.

The Government, as defendant in the present case, made no effort at the trial of the issue to establish that actual fraud existed in connection with the entry or liquidation of the entries involved in the importations in issue. Conceiving the limit of its burden to be to establish that, within 2 years after the liquidations involved in the 24 entries, the collector found probable cause to believe there was fraud in the cases, the defendant. established that the information upon which the collector came to the conclusion that there was probable cause to believe there was fraud was contained in the report of a supervising customs. agent and a customs agent.

Although, at the trial, it was stated: by the deputy collector of the Liquidating Division at Seattle, who apparently had immediate charge of the matter, that the report and documents pertaining thereto were in the collector's or liquidator's office at the time of trial, the report. was not offered or produced at the trial' of the issue. Even if it were to be assumed that the defendant's burden was. to prove only that the collector had probable cause to believe there was fraud in the cases, *it is difficult to see how this court could come to any intelligent conclusion in that matter without actually having before it all of the information. which was before the collector at the time he made his finding of probable cause.* The question would be whether the collector had probable cause to believe there was fraud. To determine that question, it would be necessary to:

know exactly what he had before him which would warrant his finding. Anything less would make a mockery of judicial review.

The only evidence offered to the court, which was identified as having been before the collector at the time he made his finding, and might tend to support the finding, are copies of a series of letters between the Canadian exporting company and one of its American customers (defendant's exhibits F–1, F–2, K and L), from which it appears that, at the time the merchandise involved herein was being shipped, the customer wished assurance that the merchandise invoiced to it as "Crude Sperm Oil" was actually "45° Natural Winter Sperm grade," and a copy of a contract between the Canadian exporter and another American customer, entered into at the time here pertinent, in which the merchandise was described as "Filtered Sperm Oil" (defendant's exhibit M). The replies to the letters of the first customer were to the effect that the oil was "not Crude Sperm Oil, but Natural Winter Sperm Oil as described in our Declaration of Guarantee."

The deputy collector, who made the original finding of probable cause to believe there was fraud in the cases, stated that he believed that the fraud was committed by the statements made on the invoices by the exporting company that the sperm oil was crude "when in fact they knew that it had been processed."

There is nothing to show that at that time standards of what constituted "processed" sperm oil as distinguished from "crude" sperm oil existed in the trade and commerce dealing in such commodities. As a matter of fact, the term "processed" does not seem to have been used in a commercial way in relation to sperm oil. The record indicates that sperm oil is purchased and sold upon specifications or analysis, rather than by name or description, and it further shows that, at the time in question, the Canadian exporter had been unsuccessfully seeking information from local customs authorities as to the specifications of what would be considered crude sperm oil within the meaning of that term as used in the tariff act.

Moreover, as will be developed, *infra*, there had been many judicial decisions, and likewise, presumably, administrative decisions, indicating that, for certain tariff purposes, the application of some processes to raw material, or material in its native state, or to the crudest form of the material known to commerce, would not be considered processes taking the same out of the tariff designation of "crude." Under these circumstances, it can hardly be said that the Canadian exporter know at the time the merchandise involved was invoiced that the sperm oil had been so processed as to be removed from the scope of the *tariff* term "crude" and embraced by the *tariff* designation "processed."

We are satisfied that the defendant did not sustain the burden of proving either that actual fraud existed or that the collector was warranted in finding that he had probable cause to believe that there was fraud in the cases. The claim in each of the 24 protests, enumerated in schedule "A" of the schedule of protests, attached to this decision, that the reliquidation of the entries involved therein was illegal and void is, therefore, sustained, and judgment will issue accordingly.

The remaining 44 protests, enumerated in schedule "B" of the schedule of protests, hereto attached, are before us on the merits of the issue. The facts, as developed in the record, are as follows: Sperm oil is obtained from the head and other parts of the whale, chiefly by rendering the blubber to extract the oil from the tissues. In order to remove water and impurities, such as meal, bone, or tissues, the oil so derived may be centrifuged while still on board of the whale-catching ship, or so-called "whale factory." There is no question but that no specific effort is made to remove the spermaceti wax from the oil while on the ship, and that such oil, when brought ashore, is known as "crude sperm oil"

and is bought and sold as an article of commerce in that condition.

Such crude sperm oil contains spermaceti wax. While the record is not very clear on the point as to whether the spermaceti wax contained in the crude sperm oil as it comes from the whaling ship or whale factory is a relatively desired product, it does indicate that for most, if not all, of the purposes for which sperm oil is used it is necessary to remove as much of the spermaceti wax as possible.

It further appears that if the crude sperm oil is allowed to stand in tanks and reach a certain temperature, for example, 60 degrees Fahrenheit, some of the spermaceti wax will become solid and settle out of the oil and deposit on the bottom of the tank. There is a certain temperature, called the "cloud-point," as the oil is cooled further, which is the lowest temperature at which the spermaceti wax will deposit, and, at this lowest temperature, the greatest amount of wax will be deposited as compared with deposits at higher temperatures. Not all of the spermaceti wax can be separated from the oil by this means, inasmuch as the oil itself will become semisolid at temperatures very little below the cloud point.

It appears that sperm oil which has had removed as much spermaceti wax as can be deposited at a cloud point of 45 degrees Fahrenheit is suitable for some commercial purposes as is, or to be further, processed, and there is no dispute that the oil in issue is such oil and is known as "45° Natural Winter Sperm Oil."

The separation of the wax from the crude sperm oil can be effected by nature, merely by allowing the oil to remain in tanks, until the surrounding outside temperature causes the temperature of the oil to reach 45 degrees F., and pumping off the clear oil on the top of the tank from which most of the spermaceti wax has settled out.

However, in view of the fact that the outside temperature is not often exactly as desired for the purpose, and, moreover, might vary in a short period of time, the same result can be obtained by artificial means by heating crude sperm oil which is colder than 45 degrees, or by chilling crude sperm oil which is warmer than 45 degrees, to the 45-degree temperature. Instead of allowing the spermaceti wax to settle out, which is probably a slow process, the 45-degree oil is then pumped through hydraulic presses, or filters, consisting of canvas cloth held in iron frames. A metal plate presses the 45-degree oil against the canvas filter, and the wax is deposited on the cloth and the clear oil goes through.

There is evidence that such results can also be obtained by another process, using a solvent, temperature, and pressure.

It is clear, however, that whether produced by pumping off the oil from which the spermaceti wax was separated by natural temperature, or by artificial chilling, or heating and filtering, or by the solvent, temperature, and pressure method, the sperm oil which results is known as "45 degree Natural Winter Sperm Oil" and is the product at bar.

The question is, whether sperm oil which has had a portion of the spermaceti wax naturally present in it removed by any of the three stated methods (and which will hereinafter be referred to as "dewaxed oil") is still "crude" or whether it falls within the meaning of the term "processed" as used in the tariff act provision. There does not seem to be any question but that such oil has not been "refined" within the meaning of that term as used in the act.

No party to the cases at bar contends that the terms "crude sperm oil" or "processed sperm oil," or those terms in the forms as used in the tariff act, viz., "Oils, * * * sperm, crude" and "Oils, * * * sperm, * * * processed," had any meaning in the trade and commerce of the United States dealing in such oil at and prior to the passage of the Tariff Act of 1930 which was different from their common meanings. There is, therefore, no issue which arises under the doctrine of commercial designation, and the terms are to be accorded their meaning in ordinary speech.

It is at once apparent that, in considering the common meanings of the tariff terms which are in competition with each other in this case, the issue must turn on the meaning to be accorded to the term "crude" and to the term "processed," as used in paragraph 52, *supra*. The term "crude" is very frequently encountered in tariff provisions and has many times been the subject of judicial decision. Plaintiffs rely upon interpretations of that term as contained in two series of cases.

The first series of cases are those where it has been held that processes involving the separation of materials associated in nature in order to get one of the materials by itself are not considered to be processes which advance the desired material so as to remove it from the tariff designation of "crude." A leading case of this type is United States v. Sheldon & Co., 2 Ct.Cust.App. 485, T.D. 32245, involving an importation of gum resin. It appeared in that case that, in nature, gum resin is associated with turpentine and, in being gathered, becomes associated also with various impurities, such as chips, bark, insects, and dirt. To get the gum resin by itself, the natural material, oleoresin or crude turpentine, was distilled, whereby the turpentine was carried off, and then screened, whereby the impurities were separated.

In the determination of the issue, the court was confronted with the question of whether the separation of the gum resin from the turpentine by the distilling process and/or the separation of the gum resin from the impurities by the screening process advanced the product from the crude state. Inasmuch as the article which emerged from the distillation was the first appearance of gum resin, the parent substance being oleoresin or crude turpentine and *not* gum resin, the court found that the gum resin in that state (in which it still contained the impurities) was crude gum resin. The court further held that the separation of the impurities from the gum resin by the screening process did not advance the product from the condition of "crude," inasmuch as the screening process was merely a cleansing process and, as such, did not change the character of the crude gum resin itself but only made it crude gum resin of a better or higher grade.

We are of the opinion that there is no true analogy between the situation in the Sheldon case and that in the case at bar. In contradistinction to the distillation process involved in the Sheldon case, the process by which the imported sperm oil (45-degree natural winter sperm oil) was produced did not result in the first appearance of sperm oil nor did it separate sperm oil from some other substance than sperm oil. It removed from admittedly crude sperm oil, a constituent—spermaceti wax—naturally present therein and one which was not there as an impurity. Nor was the process analogous to the process whereby the impurities were screened out in the case of the gum resin in the Sheldon case. The process to which the crude sperm oil was subjected in this case did, in fact, change the character of the original sperm oil by dewaxing it.

The second line of cases relied upon by the plaintiffs herein is represented by the case of United States v. Danker & Marston, 2 Ct.Cust.App. 522, T.D. 32251, and stands for the proposition (as expressed in the headnote supplied by the court in that case) that—

"Though an article may have been processed, if, as a matter of fact, it must be subjected to some additional process to fit it for its chief or only use, it is, so far as that use is concerned, a crude article. * * * "

In Merck & Co. v. United States, 5 Ct.Cust.App. 347, T.D. 34549, the principle was expressed as follows:

"The term "crude" is not confined to something which is in a natural or raw state—something which has not been processed or prepared. "Crudeness" is a relative term, and

whether an article is crude is to be determined not by the processes which brought it into being, but by the additional processes to which it is submitted after its creation in order to fit it for its chief or only use.
\* \* \* "

Counsel for the plaintiffs points out, in the brief filed in their behalf, that the record shows that from its imported condition the dewaxed or 45-degree natural winter sperm oil here involved must undergo considerable processing or treatment before being fit or ready for any of its industrial uses.

■ We are of the opinion that the principle of the Danker & Marston case, supra, has application in the situation at bar. It is important, however, to note that, in the Danker & Marston case, our appellate court held that the term "crude" is a relative term, and that that court has many times said:

"The term "crude" as used in tariff legislation, is a relative term its meaning depending upon its use in the context."

United States v. Richard & Co., 8 Ct.Cust. App. 304, T.D. 37583; Fynaut & Popek v. United States, 23 C.C.P.A.Customs 265, T.D. 48112; United States v. Nichols Copper Co., 29 C.C.P.A. 186, C.A.D. 190; and Reichard Coulston, Inc., v. United States, 34 C.C.P.A. 108, C.A.D. 350.

An example of the application of the principle is to be found in the case of Hopkins Co. v. United States, 12 Ct. Cust.App. 296, T.D. 40312, where the competition was between tariff provisions for "camphor, crude," and "camphor, refined," and the record showed that the involved camphor had been processed to a certain extent but not sufficiently to be used for the chief use of refined camphor. The merchandise was, therefore, held to be crude camphor.

The term "crude" in the present case is used in context with, and in opposition to, the term "refined or otherwise processed." The record indicates that little,

if any, use is made of sperm oil in the form in which it comes from the whaling ship, that is to say, all, or virtually all of it, is subjected to a spermaceti wax-removing process or treatment, such as was the oil at bar, before any use can be made of it. According to the record, about 15 percent of the dewaxed oil is used in the condition of the oil at bar, some of it as is, and some with the physical admixture of other compounds, and about 85 percent of the dewaxed oil is subjected to further treatment, such as refining, sulfating, sulfonizing, or some other form of chemical or other processing.

Thus, it would appear that all crude sperm oil must first be subjected to a dewaxing process before any use can be made of it, and that, when dewaxed, it is ready for certain immediate minor uses, but is *chiefly* used as the basis for further treatment, which may include refining. It is to be noted that dewaxing is a process which all sperm oil undergoes *before* refining.

■ If the term "or otherwise processed," which is associated with the term "refined," as used in paragraph 52, *supra*, is to be understood as referring to processes the equivalent of, although different from, refining, it would mean processes to which sperm oil is subjected after dewaxing. If, on the other hand, the term "or otherwise processed" is to be understood as referring to *any* process to which the crudest form of sperm oil may be subjected, including dewaxing, it would seem that the inclusion of the term "refined" would have been wholly unnecessary. It would seem that, in view of the opposition of the terms "crude" and "refined or otherwise processed" in their application to sperm oil in paragraph 52, *supra*, the rule of *noscitur a sociis* should be applied. Construed by the application of that rule, the term "otherwise processed" in that provision must be held to have reference to processes, which, like refining, take place after dewaxing, from which it follows that the dewaxed oil is, from a tariff standpoint, crude.

The claim made in each of the protests enumerated in schedule "B" for duty at the rate of 1¼ cents per gallon under paragraph 52, as modified, is, therefore, sustained, and judgment will issue accordingly.